# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GREGORY A. GRIFFIN,        )
                                    )
                  Petitioner,    )
                                    )
                     v.         )         1:15CV694
                                    )
GEORGE SOLOMON,           )
                                    )
                  Respondent.   )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (Docket Entry 1.) Respondent has moved for summary judgment. (Docket Entries 19, 20.) For the reasons that follow, the Court should grant Respondent's Motion for Summary Judgment.

## I. Background

On May 9, 2013, a jury in the Superior Court of Cabarrus County found Petitioner guilty of the offenses of breaking and entering and of possessing burglary tools (both as an habitual felon), whereupon the Superior Court imposed two, concurrent prison sentences of 146 to 185 months. (See Docket Entry 1, ¶¶ 1-6; Docket Entry 4-5 at 64, 70, 74-77.)[1] Petitioner appealed to the

---

[1] The Petition consists of 10 pages of a standard form, followed by 46 pages of materials from Petitioner's underlying state criminal case(s) (see Docket Entry 1), with additional such documents appended as Exhibit A (see Docket Entry 1-1) and Exhibit B (see Docket Entry 1-2). This Memorandum Opinion cites to the standard form portion of the Petition by paragraph and to the remainder of the Petition, as well as Exhibits A and B, by the page number in the footer appended to those materials at the time of their docketing in the CM/ECF system. Respondent also attached to his brief in support of an earlier motion to dismiss documents from Petitioner's state criminal proceedings (see Docket Entries 4-2 to 4-21), the authenticity of which Petitioner has not contested (see Docket (continued...)

North Carolina Court of Appeals and received appointed appellate counsel.  (See Docket Entry 4-5 at 83-85.)  The North Carolina Court of Appeals affirmed.  North Carolina v. Griffin, No. COA13-1093, 233 N.C. App. 239 (table), 2014 WL 1384371 (Apr. 1, 2014) (unpublished).[2]  Petitioner (acting pro se) then forwarded to the Supreme Court of North Carolina a "Notice of Appeal" (Docket Entry 4-14 at 9), which that court dismissed, North Carolina v. Griffin, 367 N.C. 506, 759 S.E.2d 101 (2014).

Next, Petitioner filed a Motion for Appropriate Relief ("MAR") with the Cabarrus County Superior Court.  (Docket Entry 4-17), which that court denied and dismissed (Docket Entry 4-18 at 2-3).  Thereafter, the North Carolina Court of Appeals denied Petitioner's request for certiorari review of the denial/dismissal of his MAR.  (Docket Entry 4-21 at 2.)

Petitioner subsequently instituted this action via his Petition.  (Docket Entry 1.)  Respondent filed a Motion to Dismiss or, in the Alternative, Motion for More Definite Statement (Docket Entries 3, 4), and Petitioner responded (Docket Entries 6, 7).[3]

_____

[1](...continued)
Entries 6, 7).  This Memorandum Opinion cites to those items by the page number in their CM/ECF footers.  Hand-written portions of Petitioner's filings frequently feature all capital letters, but (for ease of reading) this Memorandum Opinion employs standard capitalization conventions when quoting such filings.

[2] Prior to the above-referenced ruling by the North Carolina Court of Appeals, Petitioner submitted numerous pro se motions, all of which the North Carolina Court of Appeals rejected.  (See Docket Entry 4-8 at 3-4.)  Petitioner then filed with the Supreme Court of North Carolina a "Petition for Discretionary Review under N.C.G.S. 7A-31" as to various of those motions.  (Docket Entry 4-9 at 4-9.)  The Supreme Court of North Carolina denied that petition on April 10, 2014.  North Carolina v. Griffin, 367 N.C. 498, 757 S.E.2d 899 (2014).

[3] Petitioner's Amendment Response to State's Answer includes detailed factual allegations as to the four grounds set forth in the Petition.  (See
(continued...)

-2-

The Court (per United States District Judge Loretta C. Biggs) denied Respondent's Motion to Dismiss, and denied as moot Respondent's alternative Motion for More Definite Statement. (Docket Entry 17.)

Respondent then filed the instant Motion for Summary Judgment and supporting Brief (Docket Entries 19, 20), Petitioner responded (Docket Entry 22), and Respondent replied (Docket Entry 23).[4]

## II. Facts

On direct appeal, the North Carolina Court of Appeals summarized the trial evidence as follows:

> In the early morning hours of 2 April 2010, Christopher Andrew Shoe, Douglas Harwood, and a third employee were stocking shelves inside a closed Bi-Lo grocery store in Kannapolis. As Shoe worked near the front of the store, he heard loud popping noises coming from the front door. After calling out to the other employees that something was happening, Shoe went to the customer service desk about twenty feet from the front door. From that location, Shoe could see a man he later identified as [Petitioner] prying open the door with what appeared to be a long metal screwdriver. Shoe saw [Petitioner]'s face in the crack of the doorway as the door popped open and the store alarm began to sound. On hearing the alarm, [Petitioner] ran across the store parking lot,

---

[3] (...continued)
Docket Entry 7 at 2-7.) That filing also adds a new "Ground V: Violation of Petitioners [sic] . . . right to a [sic] impartial jury" (id. at 7), with supporting factual allegations (see id. at 7-8). The undersigned construed Petitioner's Amendment Response to State's Answer as a motion to amend his Petition under Federal Rule of Civil Procedure 15(a)(1) (see Docket Entry 13 at 4 n.4), which added Ground V to the Petition.

[4] Petitioner filed a sur-reply without leave of Court. (Docket Entry 24.) This Court's Local Rules do not allow sur-replies. See M.D.N.C. LR7.3. In addition, Petitioner has filed two requests to amend/supplement Grounds Two and Four of the Petition with additional factual allegations. (Docket Entries 25, 26.) However, Respondent did not move to strike the sur-reply (see Docket Entries dated Nov. 23, 2016, to present), and has not responded to Petitioner's requests to amend/supplement his Petition (see Docket Entries dated Nov. 29, 2016, to present). Even considering the substance of those documents, none changes the basis of the undersigned's Recommendation.

-3-

jumped into a van, and drove away down South Cannon Boulevard.

Harwood testified that he had come to the front of the store when Shoe called out to him. From a distance of about ten feet, Harwood saw a man wearing a plaid hooded jacket and jeans prying open the front door with a screwdriver. Harwood saw the face of the man whom he later identified as [Petitioner] and, after the alarm sounded and [Petitioner] fled in a red van, Harwood called 911.

Several officers with the Kannapolis Police Department, including Timothy Lafferty and Steven Webb, responded to the 911 call, and a red Ford Aerostar van was stopped a few minutes later on South Cannon Boulevard, about a mile and a half from the grocery store. After removing the driver and passenger from the van, the officers searched the cargo area. They found, inter alia, a fifty-five-gallon trash can, a large screwdriver, and a duffel bag filled with plastic bags of clothing which still had price tags and security sensors attached.

Harwood, who was still on the phone with a 911 operator, was told that police "had him [the perpetrator] in custody already." Webb picked up Shoe and Harwood from the grocery store and drove them in a patrol car to the location where the van had been stopped. Shoe and Harwood identified [Petitioner], who was standing behind the red van, as the man who had pried open the door. Harwood was also able to identify the van as the vehicle in which [Petitioner] had fled the grocery store parking lot. Shoe testified that he had been shown two men during the show-up, one of whom he identified as the perpetrator. Harwood testified that he had seen only [Petitioner] at the show-up.

Griffin, 2014 WL 1384371, at *1 (footnote omitted).

### III.  Grounds for Relief

Petitioner has presented five grounds for habeas relief. (See Docket Entry 13 at 4 (analyzing Docket Entries 1, 7).) Specifically, he has alleged:

1) ineffective assistance of trial and appellate counsel, (A) because trial counsel "failed to file timely motions for discovery and/or move for subpoenas for surveillance tapes, or witnesses who

-4-

initiated the investigation of the case and were responsible for evidence of surveillance . . .[,] [and] fail[ed] to suppress evidence of an illegal search" (Docket Entry 7 at 2), and (B) because appellate counsel "settled [the] record on appeal, and filed [Petitioner's] brief without [his] knowledge, agreement and/or informed consent of the issues that made-up the settled record, and appeal brief[,] . . . [and] mislead [sic] [Petitioner] into believing that preserved issues from trial concerning video tapes, and discovery issues would be included in the brief[] so that the issues could be raised in a post-conviction proceeding" (id.);

2) violation of "due process" and/or "equal protection," as a result of (A) "the [trial] judge's assumption that a key piece of evidence [i.e., a surveillance video tape] no longer existed, based on a [sic] unsubstantiated, alledged [sic] and assumed phone call by the State," (B) "the prosecutor['s] state[ment] that he had no idea where the tape is, or if, it was saved, destroyed, or . . . what the outcome of the tape is [and that he had not] sought to get the tape," (C) "the prosecutor['s] knowing[] use[ of] staged testimony in order to elicit, and introduce fabricated evidence, and testimony in order to conceal evidence of an illegal search, and misrepresent the actions of [law enforcement officers]," (D) the trial judge's "deni[al of defense] counsel's motion for continuance, in order to determine the truth of the matter [regarding the existence of a surveillance video tape]," and (E) the "prosecutor['s] question[ing of] it's [sic] witness extensively

-5-

concerning what was/wasn't on a particular tape" (id. at 3-4 ("Ground Two"));

3) "[v]iolation of Petitioner's right against an unreasonable search and seizure" (id. at 5 ("Ground Three"));

4) "[v]iolation of Petitioner's right for failure to disclose favorable evidence," arising from the fact that Petitioner and his trial counsel "made a total of 4 motion[s]/request[s] for discovery of video surveillance, and witnesses responsible for the surveillance, the States [sic] response to the request, and the fact that the State elicited evidence of what's depicted on the requested evidence, (that was not produced) from a State's witness" (id. at 6-7 ("Ground Four")); and

5) "[v]iolation of Petitioner['']s [federal constitutional] right to a [sic] impartial jury" (id. at 7 ("Ground Five")).

### IV. Habeas Standards

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999);

-6-

<u>see also</u> 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").[5]

When a petitioner has exhausted state remedies, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Id.</u> To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."

---

[5] The Court may deny a claim on the merits despite a lack of exhaustion. <u>See</u> 28 U.S.C. § 2254(b)(2).

Id. at 407; see also id. at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

## V. Discussion

### A. Procedural Default

As an initial matter, Respondent maintains that Grounds Two through Five of the Petition face a procedural bar. (See Docket Entry 20 at 2-3.) According to Respondent, the MAR court, "[i]n addition to finding no merit, . . . found that except for 'some of the ineffective assistance of counsel claims, the grounds or issues alleged in [Petitioner's] [MAR] could have been raised at trial or *[Petitioner] was in a position to adequately raise such grounds or issues in the previous [direct] appeal to the North Carolina Court of Appeals, but did not do so*.'" (Id. (quoting Docket Entry 4-18 at 2, and citing N.C. Gen. Stat. § 15A-1419(a)(3) (listing as grounds for denial of MAR that "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so")) (emphasis added by Respondent).)

"Federal habeas review of a state prisoner's claims that are procedurally defaulted under independent and adequate state procedural rules is barred unless the prisoner can show cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or prove that failure to consider the claims will result in a fundamental miscarriage of justice." McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). Moreover, the Fourth Circuit "ha[s] consistently held that § 15A-1419(a)(3) is an

independent and adequate state ground for purposes of procedural default." <u>Lawrence v. Branker</u>, 517 F.3d 700, 714 (4th Cir. 2008). Accordingly, Petitioner must show either cause and actual prejudice or a miscarriage of justice, in order to proceed with Grounds Two through Five.

Petitioner alleges that "a procedural default determination [and] ruling should be excused," because his appellate counsel provided ineffective assistance. (Docket Entry 22 at 8; <u>see also</u> Docket Entry 7 at 2.) "In some circumstances, a defendant may establish cause [for procedural default] if he was represented by counsel whose performance was constitutionally ineffective under the standards established in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)." <u>Fowler v. Joyner</u>, 753 F.3d 446, 460 (4th Cir. 2014) (internal parallel citations omitted). Here, however, Petitioner has not shown constitutionally deficient representation by his appellate counsel.

Petitioner presented the substance of his appellate ineffective assistance claim to the state trial court in his MAR. (<u>See</u> Docket Entry 4-17 at 8-9, 29-31, 87-109.) That court denied that claim on the merits as follows:

> With regard to [Petitioner's] claim that he received ineffective assistance of counsel regarding appellate issues in the case, the supporting material that [Petitioner] submitted with the current MAR under consideration does not support his contention.

(Docket Entry 4-18 at 2.) Under these circumstances, this Court must apply Section 2254(d)'s highly deferential standard of review

-9-

to Petitioner's parallel ineffective assistance of appellate counsel claim.

In order to prove ineffective assistance of appellate counsel, Petitioner must satisfy the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Smith v. Murray, 477 U.S. 527, 535–36 (1986) (applying Strickland standard to claim of appellate ineffective assistance); Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (en banc) (same). More specifically, Petitioner must show that (1) his appellate counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced Petitioner, i.e., a reasonable probability that, but for his appellate counsel's unprofessional errors, the result of the proceeding would have changed. See Strickland, 466 U.S. at 678–88, 694. Further, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Courts likewise presume that appellate counsel "decided which issues were most likely to afford relief on appeal." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993).

Moreover, the United States Supreme Court has cautioned that "[s]urmounting Strickland's high bar is never an easy task. . . . Even under de novo review, the standard for judging counsel's representation is a most deferential one." Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal quotation marks omitted). Further, "[w]here the issue is whether the state court has unreasonably applied Strickland standards to a claim of ineffective

-10-

assistance of counsel, . . . double deference is required. . . ."
Lavandera-Hernandez v. Terrell, No. 1:12-cv-553, 2013 WL 1314721,
at *4 (M.D.N.C. Mar. 28, 2013) (Schroeder, J.) (unpublished)
(internal quotation marks omitted); see also Harrington, 562 U.S.
at 105 ("The standards created by Strickland and § 2254(d) are both
highly deferential and when the two apply in tandem, review is
doubly so." (internal citations and quotation marks omitted)).

Accordingly, when the Court's examination of an ineffective
assistance claim proceeds under Section 2254(d), "[t]he question is
whether there is any reasonable argument that counsel satisfied
Strickland's deferential standard." Harrington, 526 U.S. at 105;
see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (observing
that Section 2254(d) imposes "a difficult to meet and highly
deferential standard . . ., which demands that state-court
decisions be given the benefit of the doubt . . . [and that a]
petitioner carries the burden of proof" (internal citations and
quotation marks omitted)). In other words, "under the dual,
overlapping lenses of [Section 2254(d)] and Strickland [the Court
must] ask[ ] the following question: Was the [MAR court]'s holding
incorrect to a degree that its conclusion was so lacking in
justification that it was an error well understood and comprehended
in existing law beyond any possibility for fairminded
disagreement?" Moore v. Hardee, 723 F.3d 488, 496 (4th Cir. 2013)
(internal brackets, ellipses, and quotation marks omitted). Under
this exacting standard, the Court concludes that the MAR court's

-11-

denial of this ineffective assistance claim did not contradict or unreasonably apply Strickland.

Here, Petitioner asserts the ineffectiveness of his appellate counsel because appellate counsel "settled [the] record on appeal, and filed [Petitioner's] brief without [his] knowledge, agreement and/or informed consent of the issues that made-up the settled record, and appeal brief[,] . . . [and] mislead [sic] [Petitioner] into believing that preserved issues from trial concerning video tapes, and discovery issues would be included in the brief[] so that the issues could be raised in a post-conviction proceeding." (Docket Entry 7 at 2.) In essence, Petitioner maintains that his appellate counsel failed him by declining to argue the substance of Grounds Two through Five on appeal. (See Docket Entry 7 at 2 ("The reason why the[] issues [in Ground One] were not raised on direct appeal is my appellate attorney disregarded my concerns, settled the record, and filed the brief without my agreement or knowledge of the settled issues."); see also id. at 3, 4, 5, 6, 7, 8 ("These issues were not briefed on direct appeal for the same reasons given for Ground [One].").) Petitioner's contentions fail.

As an initial matter, correspondence between Petitioner and his appellate counsel (see Docket Entry 4-17 at 87-88, 90-106) belies Petitioner's assertion that his appellate counsel "mislead [sic] [him] into believing that preserved issues from trial concerning video tapes, and discovery issues would be included in the [appellate] brief" (Docket Entry 7 at 2 (emphasis added)). Petitioner's appellate counsel sent Petitioner a letter, prior to

-12-

__filing the brief__, which provided the following information to Petitioner:

> I had a meeting with three other experienced attorneys in my office to discuss your case. We all agreed that __this office has insufficient information to argue ineffective assistance of counsel in your direct appeal__ . . . .
>
> . . .
>
> __I will not brief numbers 2, 4, 5, 6, 9, 15, 16, 17, 18, 19, and 20__ [in the list of proposed issues in the settled record on appeal (<u>see</u> Docket Entry 4-5 at 89-90)]. The law is against us on these issues. __I have not made any decisions about the other issues.__ I am still researching the other issues and working on your brief.

(Docket Entry 4-17 at 91 (emphasis added).) Thus, __before filing the brief__, Petitioner's appellate counsel advised Petitioner that she __would not argue__ that (1) Petitioner "was denied his constitutional right to effective assistance of counsel by trial counsel's __failure to file a timely motion for discovery__" (Docket Entry 4-5 at 90 (issue 21) (emphasis added));[6] (2) "[t]he trial court erred by denying [Petitioner's] motion for a continuance until it could be determined whether a __surveillance videotape__ of the break-in existed" (__id.__ at 89 (issue 4) (emphasis added)); and (3) "[t]he trial court committed plain error by admitting testimony about the contents of a __surveillance videotape__ that was not produced or introduced in evidence" (__id.__ at 90 (issue 15) (emphasis

---

[6] Petitioner's appellate counsel did include in the brief an argument in the alternative that, if the Court of Appeals did not find plain error in the trial court's admission of the witnesses's show-up and in-court identification of Petitioner, then Petitioner's trial counsel provided ineffective assistance by failing to move to suppress that evidence. (<u>See</u> Docket Entry 4-6 at 43.) The Court of Appeals dismissed that claim without prejudice, finding that, "[i]n general, claims of ineffective assistance of counsel should be considered through [MARs] and not on direct appeal." <u>Griffin</u>, 2014 WL 1384371, at *9.

added)).  (Docket Entry 4-17 at 91.)  Moreover, Petitioner's appellate counsel made clear that she had <u>not made any decisions</u> about whether she would brief the issue of whether "[t]he trial court erred by denying [Petitioner's] <u>motion for sanctions for a discovery violation</u>" (<u>id.</u> at 89 (issue 3) (emphasis added)).  (Docket Entry 4-17 at 91.)  Thus, Petitioner's claim that his appellate counsel misled him fails as a matter of law.

To the extent Petitioner claims that appellate counsel's failure to obtain Petitioner's agreement regarding the record on appeal and/or the issues on appeal in and of itself constitutes ineffective assistance, that claim also fails.  Appellate counsel's choice of which issues to raise on appeal constitutes a virtually unassailable strategic decision left to counsel's discretion.  <u>See</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983).  Thus, counsel labors under no obligation to raise on appeal every non-frivolous issue requested by a defendant.  <u>See</u> <u>id.</u> (stating that no decision "of this Court suggests . . . that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points").

Moreover, Petitioner's contention that his appellate counsel failed him by not raising the substance of Grounds Two through Five on appeal similarly fails.  In that regard, Petitioner must show that his "appellate counsel failed to present significant and obvious issues on appeal."  <u>Gray v. Greer</u>, 800 F.2d 644, 646 (7th

-14-

Cir. 1986).   In other words, Petitioner can overcome the presumption of effective assistance of counsel only by showing that the omitted issues clearly possess more merit than those actually raised on appeal.   Id.

Here, Petitioner falls far short of showing deficient performance by his appellate counsel.   In correspondence to Petitioner, his experienced appellate counsel carefully and clearly explained her reasoning for raising more meritorious issues and omitting others unlikely to succeed:

> I received your letter today and will try to answer your questions.
>
> First, I am not allowed to file a brief longer than 35 pages.  As I have tried to explain previously, there are significant legal weaknesses with every one of the possible issues.  I selected issues for the brief that I felt have the best chance of success.  Because you told me you were not the perpetrator, I decided the theme of the brief should be that the witnesses identified the wrong person.  I selected the issues that I thought fit best into this overall theme.
>
> I had three reasons for not including the issue about the motion for sanctions.  The first reason is that, at the time the motion was heard, no one knew what was on the tape.  Since you could not show the court that the tape would have helped you, the law required you to show the state acted in bad faith by not preserving it.  Very little information was presented to the court about what happened with the tape.  There was no evidence about bad faith.  The trial court found there was no bad faith. There was no way for me to argue on appeal that the state acted in bad faith and the trial court was wrong, because there is nothing in the transcript that shows bad faith. Legally, it takes more than not preserving the tape to establish bad faith.
>
> The second reason I did not raise this issue is that, even if the trial court had found bad faith, the decision whether to impose sanctions is discretionary.  You asked the court to dismiss the charges, but the court did not have to do it even if [s]he believed the state acted in bad faith.  I am not aware of any case where a trial

-15-

court has dismissed a case because of discovery violations. The Court of Appeals would not say the trial court erred by not dismissing the charges.

The third reason I did not raise this issue is that, at trial, Mr. Shoe testified he watched the tape and it was too blurry to make out the person who broke in the door. This is the only evidence in the record about what was on the tape. I believe the Court of Appeals would say that loss or destruction of the tape did not prejudice you because the evidence showed the tape would not have helped you.

. . .

<u>Unfortunately, all of the legal issues in your case are pretty weak, so I made the best arguments I could make in 35 pages</u>. I believe the strongest issue in the brief is Argument I because it is preserved and because Mr. Shoe's testimony was the strongest evidence against you. We cannot add any more issues to the brief. We have used up our 35 pages. We cannot make a *Brady* argument because we cannot show the court that the tape would have helped you.

(Docket Entry 4-17 at 93-94 (emphasis added).) Counsel's correspondence thus makes clear that she carefully considered many different issues for appeal, and ultimately chose those with the best chance of success. Accordingly, Petitioner has not shown that his "appellate counsel failed to present significant and obvious issues on appeal." <u>Gray</u>, 800 F.2d at 646; <u>see</u> <u>Smith v. South Carolina</u>, 882 F.2d 895, 899 (4th Cir. 1989) ("'[W]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from evidence of incompetence, is the hallmark of effective appellate advocacy.'" (quoting <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (in turn quoting <u>Jones</u>, 463 U.S. at 751-52)) (some internal quotation marks omitted)).

Moreover, appellate counsel filed a thorough, well-argued, and professional brief with the Court of Appeals. (<u>See</u> Docket Entry 4-

-16-

6.)  Indeed, the Court of Appeals agreed with appellate counsel that the identification of Petitioner by the two Bi-Lo store employees amounted to an impermissibly suggestive show-up, but ultimately concluded that "the totality of circumstances establish that impermissibly suggestive show-up procedures did not create a 'substantial likelihood of irreparable misidentification.'" Griffin, 2014 WL 1384371, at *8-9 (quoting State v. Rawls, 207 N.C. App. 415, 424, 700 S.E.2d 112, 118 (2010)).  Under such circumstances, the MAR court reasonably applied clearly established federal law in determining that Petitioner had not shown that his appellate counsel rendered deficient performance by declining to argue the substance of Grounds Two through Five on appeal.[7]

Furthermore, in light of the strong to overwhelming evidence against Petitioner at trial, he also cannot show prejudice resulting from his appellate counsel's allegedly deficient performance.  As the Court of Appeals noted in describing the strength of the evidence against Petitioner, "[t]wo witnesses positively identified [Petitioner] as the man they saw prying open the door with a screwdriver and then fleeing in a van, and

---

[7] In the alternative, for the reasons well-stated in Respondent's brief (see Docket Entry 20 at 3-19), Grounds Two through Five lack merit, particularly when viewed through the lens of Section 2254(d) deference.  Accordingly, appellate counsel could not have rendered deficient performance by failing to argue meritless issues on appeal.  See, e.g., Ellison v. United States, Nos. 3:07CR30RJC, 3:10CV207RJC, 2013 WL 2480654, at *3 (W.D.N.C. June 10, 2013) (unpublished) ("[A]ny arguments made by counsel along the lines suggested by [the p]etitioner would have been futile.  Therefore, [the p]etitioner has failed to establish a prima facie claim of ineffective assistance of counsel."); Walker v. United States, Civ. No. WDQ-10-2739, Crim. No. WDQ-07-0146, 2011 WL 4103032, at *3 (D. Md. Sept. 9, 2011) (unpublished) (ruling that, where an argument "would have been futile[, a defendant's] appellate counsel was not ineffective for failing to raise it").

-17-

[Petitioner] was quickly stopped in a van nearby in possession of a screwdriver like that used to pry open the door." Id. at *6; see also id. at *4 ("After careful review of all the evidence at trial, we conclude that, even assuming *arguendo* that admission of the challenged testimony was error, [Petitioner] fails to show prejudice."); Woods v. Schwartz, 589 F.3d 368, 378 (7th Cir. 2009) (finding no prejudice under Strickland because "two eyewitnesses is very strong evidence of guilt").

In sum, because the MAR court did not unreasonably determine that Petitioner's appellate ineffective assistance claim lacked merit, Petitioner has not demonstrated cause sufficient to excuse his procedural default with regards to Grounds Two through Five.

B. Merits of Ground One (Ineffective Assistance of Trial Counsel)

Via Ground One, Petitioner brings claims of ineffective assistance of both his trial and appellate counsel. As discussed above in the context of evaluating whether cause existed to excuse Petitioner's procedural default, the MAR court reasonably applied clearly established federal law in determining that Petitioner's appellate ineffective assistance claim lacked merit. (See Docket Entry 4-18 at 2.) Regarding Petitioner's ineffective assistance of trial counsel claim, Respondent does not contend that a procedural bar exists (see Docket Entry 20 at 3 n.2), because the MAR court found only that "some of the ineffective assistance of counsel claims . . . could have been raised . . . in the previous appeal to the North Carolina Court of Appeals," without specifying which claims Petitioner could not have raised (Docket Entry 4-18 at 2

-18-

(emphasis added)). Accordingly, the Court should address Petitioner's trial counsel ineffective assistance claim on the merits.

Petitioner presented the substance of his ineffective assistance of trial counsel claim to the MAR court. (See Docket Entry 4-17 at 4-5, 25-29.) Despite the summary nature of the denial (see Docket Entry 4-18 at 2), that order qualifies as an adjudication on the merits, Cullen, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."). Thus, this Court must apply Section 2254(d)'s highly deferential standard of review to Petitioner's parallel ineffective assistance of trial counsel claim. Further, "[w]here the issue is whether the state court has unreasonably applied Strickland standards to a claim of ineffective assistance of counsel, . . . double deference is required. . . ." Lavandera-Hernandez, 2013 WL 1314721, at *4 (internal quotation marks omitted); see also Harrington, 562 U.S. at 105 ("The standards created by Strickland and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." (internal citations and quotation marks omitted)).

Petitioner alleges that his trial counsel (1) "failed to file timely motions for discovery and/or move for subpoenas for surveillance tapes, or witnesses who initiated the investigation of the case and were responsible for evidence of surveillance" (Docket Entry 7 at 2); and (2) "fail[ed] to suppress evidence of an illegal

-19-

search" (id.)[8]  The MAR court did not unreasonably apply <u>Strickland</u> in determining that Petitioner's allegations lacked merit.  (See Docket Entry 4-18 at 2 ("There is no merit to [Petitioner's MAR].").)

With regard to Petitioner's contention that his trial counsel rendered ineffective assistance by failing to file timely motions for discovery and/or subpoena the surveillance tapes or witnesses with responsibility over the tapes, Petitioner can show neither deficient performance nor prejudice.  Concerning deficient performance, Petitioner's own factual averments belie his contention that his trial counsel acted deficiently.  Petitioner admits in his MAR that "defense attorney James Exum made a discovery request for surveillance tapes of the crime in April

---

[8] To the extent Petitioner bases his ineffective assistance of trial counsel claim on counsel's failure to raise such claims in a second MAR, they would face a procedural bar.  See N.C. Gen. Stat. § 15A-1419(a)(1) (listing as "grounds for the denial of a [MAR] . . . [u]pon a previous [MAR], [Petitioner] was in a position to adequately raise the ground or issue underlying the present motion but did not do so"); see also Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998) ("A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991))); Bacon v. Lee, 225 F.3d 470, 476 (4th Cir. 2000) (quoting Section 15A-1419(a)(1) and stating: "We have consistently held that this provision constitutes an independent and adequate state ground that may give rise to procedural default of federal habeas claims.").  Moreover, Petitioner has failed to make any arguments that could overcome such default, see McCarver, 221 F.3d at 588 ("Federal habeas review of a state prisoner's claims that are procedurally defaulted under independent and adequate state procedural rules is barred unless the prisoner can show cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or prove that failure to consider the claims will result in a fundamental miscarriage of justice.").  (See Docket Entries 1, 7, 22, 24-26.)

-20-

2010" (Docket Entry 1 at 40), i.e., within the <u>same month as</u> <u>Petitioner's arrest</u> (<u>see</u> Docket Entry 4-5 at 5). Petitioner further admits that the state responded to trial counsel's discovery request with a memorandum dated May 10, 2010, indicating that one of the investigating officers "spoke with the Loss Prevention head of Bi-Lo and he had already checked his tapes and that there is a glare from the outside lights in the parking lot and that <u>you can not [sic] make out anything</u>." (Docket Entry 1-1 at 22 (emphasis added); <u>see also</u> Docket Entry 1 at 40.)

Although Petitioner found such a response an "unsatisfactory hearsay letter" (Docket Entry 1 at 40), he concedes that trial counsel "<u>made another request</u> [for the tapes] after [a different assistant district attorney] took over the case" (<u>id.</u> (emphasis added); <u>see also</u> Docket Entry 4-2 at 30). Moreover, the new assistant district attorney apparently advised trial counsel that the tapes no longer existed. (<u>See</u> Docket Entry 4-2 at 31 ("[The state has] given us the impression all along that [the surveillance tape evidence] does not exist."); <u>see also</u> Docket Entry 1-2 at 26 (trial counsel's notation that "[l]oss prevention says they keep videos for 30 days," and that counsel "made a timely request <u>BUT</u> they don't have it").) Under such circumstances, no reason existed for trial counsel to attempt to subpoena surveillance tapes that no longer existed. <u>See</u> <u>Moody v. Polk</u>, 408 F.3d 141, 151 (4th Cir. 2005) (holding that "[c]ounsel is not required to engage in the filing of futile motions").

-21-

The record additionally reflects that trial counsel filed and argued a motion for sanctions, asking for dismissal of the charges against Petitioner, arising out of the state's failure to produce the tapes, and moved for a continuance of the trial to allow the state more time to determine whether or not the tapes still existed. (See Docket Entry 1-1 at 20-21; see also Docket Entry 4-2 at 18-38.) The above-described sequence of events do not establish objectively unreasonable performance by Petitioner's trial counsel. See Merritt v. Hoke, No. 2:10CV47, 2010 WL 5621296, at *16 (N.D.W. Va. Nov. 19, 2010) (unpublished) (finding no ineffective assistance where trial counsel filed motion to compel to obtain zip drive containing surveillance tape, and, after finding zip drive blank, contacted state and second co-defendant's counsel in attempt to recover surveillance footage, and noting that "[i]t was also reasonable for [the p]etitioner's counsel to rely on the representations of the State that all evidence had been turned over, and it too had a blank copy of the zip drive"), recommendation adopted in pertinent part, rejected in part on other grounds, 2011 WL 198104 (N.D.W. Va. Jan. 18, 2011).

Additionally, Petitioner cannot show his trial counsel's failure to obtain copies of the surveillance tapes prejudiced him. The record reflects that lights from the parking lot produced a glare on the surveillance video that precluded Bi-Lo's head of Loss Prevention from "mak[ing] out anything." (Docket Entry 1-1 at 22.) Shoe's trial testimony further confirmed the poor quality of the video:

-22-

> [STATE:]  Would you describe for the jury like what the video showed, or what the quality was like or anything?
>
> [SHOE:]   The video quality is very, very, very poor. You could not see, no. You visually could not see who it was coming through the door. You would be able to tell if it was a white male, or a black male, or a Hispanic male. You'd be able to tell a race, but you would not be able to tell features.
>
> [STATE:]  How is it, is the camera out of focus?
>
> [SHOE:]   Yes, sir, it's very blurry and it's black and white.

(Docket Entry 4-3 at 68.) Thus, Petitioner cannot demonstrate a reasonable probability that, had his trial counsel obtained the surveillance tapes, the result of the proceeding would have changed. See Strickland, 466 U.S. at 678-88, 694.

Finally, Petitioner asserts that his counsel provided ineffective assistance by failing to move to suppress the items of evidence obtained by law enforcement from the search of Petitioner's van. (See Docket Entry 7 at 2; Docket Entry 22 at 13-15.) In that regard, Petitioner maintains that, when officers drew their guns, handcuffed Petitioner, and placed him in a patrol car, Petitioner "ha[d] been seized [and] under custodial arrest requiring 4th amendment const[itutional] protections." (Docket Entry 22 at 14 (citing Brendlin v. California, 551 U.S. 249, 255 (2007), and Oliveria v. Mayer, 23 F.3d 642, 645-46 (2d Cir. 1994)).) According to Petitioner, when an officer "raised the tailgate [of Petitioner's van] and started looking for anything that could basically tie [Petitioner and his companion Reginald Watson] to the Bi[-]Lo deal, or any criminal activity," that

-23-

officer "exceeded the scope of [Terry v. Ohio, 392 U.S. 1 (1968)]."
(Docket Entry 22 at 14.)    Further, Petitioner contends that
"[s]earches incident to arrest conducted immediately before formal
arrest are valid only if probable . . . cause to [arrest] existed
prior to the search," and claims that, in his case, officers
obtained probable cause to arrest from the warrantless search
itself, rendering the search "unjustifiable." (Id. (citing Smith
v. Ohio, 494 U.S. 541, 543 (1990)).)

The trial testimony establishes that, at about 4:45 a.m. on
April 2, 2010, Officer Timothy Lafferty of the Kannapolis Police
Department "heard the call go out that there was an attempted
breaking or entering . . . at the Bi-Lo on South Cannon" and "that
it was a red type minivan, and they had left southbound on South
Cannon Boulevard." (Docket Entry 4-3 at 106.)  Lafferty indicated
that he saw a red van with two occupants in the front seats heading
southbound on South Cannon as he was driving on the northbound side
(id. at 108, 128), but that he did not know if the van had other
occupants (id. at 131).  He also observed two other patrol cars
with their blue lights activated tailing that van, and he "crossed
the median on foot to assist with the felony vehicle stop." (Id.
at 107.)  When Lafferty reached the stopped van, described as "a
red Ford Aerostar, probably late '80's or early '90's," Lafferty
saw that "Sergeant Lear and Officer Brown ha[d] their issued
sidearms out beginning verbal commands." (Id. at 108.)  Lafferty
noticed "some obstructions . . . through the back window" of the
van, and "later learned it was a large trash can." (Id. at 122.)

-24-

The officers handcuffed the driver and the passenger of the van, and conducted patdowns of their clothing which yielded no weapons. (Id. at 157.)

Officer Steven Webb of the Kannapolis Police Department testified that, when he arrived on the scene of the stop, Sergeant Lear and Officers Brown and Lafferty had already detained the driver of the van, and the passenger "was talking back towards the officers," and officers patted down and secured both suspects. (Id. at 144.) Officer Webb observed a trash can in the back of the van, which he found "suspicious" (id.) due to the common usage of such trash cans in retail thefts (id. at 157). Webb recalled officers advising Petitioner and his companion that "they [were not] in custody, but they were being detained for their safety and [the officers's safety]." (Id. at 144.)

At that point in time, Webb, Brown, and Lear raised the back tailgate of the van and "started looking through the van" (id.) for items "that could basically tie them to the Bi-Lo deal or to any criminal activity" (id. at 145) and to "[m]ake sure there [wasn't anybody] hiding back in the back part of [the van]" (id. at 162). Webb testified: "At the beginning it's just a safety thing. That's the only thing we're concerned about is our safety and their safety. So at the beginning, although we want to preserve evidence, we want to make sure there's nobody in there with a gun or something like that. So we just do a clear sweep." (Id. at 163.) The officers found a black duffel bag with clothing inside that still had tags and security sensors from the store attached,

-25-

a "huge trash can," and "a large screwdriver." (<u>Id.</u> at 149.)  Webb
testified that he looked through the duffle bag "to make sure
there[] [were] no weapons, anything like that in there."  (<u>Id.</u> at
162.)

    Webb then drove to Bi-Lo and picked up eyewitnesses Shoe and
Harwood and brought them back to the scene of the stop for a show-
up identification of the suspects (<u>id.</u> at 145-47), a drive that
took "a minute, maybe two" (<u>id.</u> at 147.)  Officers activated a
patrol car's spotlight to "make sure that there[] [was] adequate
lighting so they could get a good look at [the suspects,] [a]nd
. . . to . . . eliminate [the suspects] from being able to see the
person that's identifying them for safety reasons."  (<u>Id.</u> at 147.)
According to Lafferty, both Shoe and Harwood identified Petitioner
as the person who attempted to break into the Bi-Lo, and indicated
they felt 100 percent certain.  (<u>Id.</u> at 147-48.)  The officers
then arrested Petitioner and Watson, seized the items found during
the search of the van, and had the van towed and inventoried.  (<u>See</u>
Docket Entry 1-1 at 7-8, 18-19.)

    The above-described trial evidence establishes that a motion
to suppress the evidence law enforcement obtained during a search
of the van would not have succeeded for three reasons.  First,
Petitioner has not established that, at the time of the van search,
officers had placed Petitioner under arrest.  Law enforcement
briefly detained Petitioner in handcuffs while conducting the
protective sweep of the van and waiting on Webb to bring the
eyewitnesses, just one to two minutes away, to the show up.

-26-

(Docket Entry 4-3 at 145-47.) Moreover, officers advised Petitioner and Watson that "they [were not] in custody, but they were being detained for their safety and [the officers's safety]. (Id. at 144.) Under such circumstances, Petitioner's brief detention did not rise to the level of an arrest. See United States v. Griffin, 589 F.3d 148, 154 & n.8 (4th Cir. 2009) (noting that, "[a]lthough [the petitioner] was restrained in the backseat of the police vehicle at the time of the search, he was being detained at that time solely pursuant to the *Terry* stop" and that he "was not yet arrested at the time of search"). Furthermore, because the search constituted a protective sweep rather than a search incident to arrest, the Smith case, relied upon by Petitioner, has no bearing.

Second, the scope of the officers's search of the van did not exceed the scope of Terry. An officer may lawfully search "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, . . . if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer[] in believing that the suspect is dangerous and . . . may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983) (quoting Terry, 392 U.S. at 21). Given the time of the encounter, the nature of the suspected crime, and the obstruction of the officers's view into the back of the van by the large trash can, "the officers did not act unreasonably in taking preventive

-27-

measures to ensure that" the van did not contain other occupants (or weapons such occupants could use). Long, 463 U.S. at 1050. Moreover, law enforcement's discovery of the trash can, duffel bag full of tagged clothing, and the screwdriver during the protective search remains permissible, because, "[i]f, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances," id., and "police may examine the contents of any open or closed container found within the passenger compartment," id. at 1049.

Third, even if the trial court had found the officers's search of the van exceeded the permissible bounds of Terry, that court would likely have ultimately denied the motion to suppress under the inevitable discovery doctrine. That doctrine permits the admission of evidence which, although "in some sense the product of illegal governmental activity[,] . . . ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). Here, officers obtained probable cause sufficient to arrest Petitioner, wholly independent of the items officers discovered during the protective sweep of the van, when Shoe and Harwood both identified Petitioner as the perpetrator with 100 percent certainty. (See Docket Entry 4-3 at 147-48.) At that point, law enforcement could have searched the van and found the same evidence. See Arizona v. Gant, 556 U.S. 332, 343 (2009) ("[W]e also conclude that circumstances unique to the vehicle

context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" (quoting Thornton v. United States, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)).

Moreover, "[p]olice officers frequently perform inventory searches when they impound vehicles or detain suspects." United States v. Hairston, 409 F. App'x 668, 670 (4th Cir. 2011). "A proper inventory search is merely an incidental administrative step following arrest and preceding incarceration, conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." United States v. Banks, 482 F.3d 733, 739 (4th Cir. 2007). Here, officers impounded the van in which they stopped Petitioner, and conducted an inventory search of its contents. (See Docket Entry 1-1 at 18-19.) Thus, even "if the officer[s] had not conducted a search incident to arrest, . . . the evidence in question would have [inevitably] been discovered" in the inventory search. Hairston, 409 F. App'x at 670.

In short, a motion to suppress the evidence officers found in the van would have failed and thus trial counsel did not provide deficient performance by opting against pursuing a meritless motion. See Moody, 408 F.3d at 151 (holding that "[c]ounsel is not required to engage in the filing of futile motions"). Accordingly, the MAR court did not unreasonably apply Strickland in denying Petitioner's parallel ineffective assistance claim.

-29-

## VI. Conclusion

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 19) be granted, that the Petition (Docket Entry 1) be denied, and that Judgment be entered dismissing this action without issuance of a certificate of appealability.


                                    /s/ L. Patrick Auld
                                 **L. Patrick Auld**
                          **United States Magistrate Judge**

July 14, 2017